## ATTORNEY GENERAL *vs.* RECTOR AND CHURCHWARDENS OF TRINITY CHURCH & others.

If a testator devises an estate to the rector and churchwardens of a church, in trust, out of the rents and profits thereof to pay a certain sum annually to the church, for its own use; and certain other sums annually for certain public charities; and makes no specific disposition of any surplus which may exist or arise; yet if it does not appear that such surplus is unexpected by him, and he in various parts of the will indicates that he intends the devise for the benefit of the church, and it subsequently proves that there is a large surplus, the church will be entitled to hold it, for its own use.

A testator devised an estate in remainder to the rector and churchwardens of a church, of which he was a member, in trust, to pay yearly, out of the rents and profits thereof, forty shillings to the church, for its own use; sixteen pounds annually for the support of a course of sermons; forty shillings annually for the use of the poor of three specified churches; and to put the remainder at interest, to be called in, as there might be occasion, for repairing, enlarging or rebuilding the premises, and also for keeping his tomb in repair; and, in case the rents and profits should be more than sufficient for these purposes, then to put the surplus out at interest, but making no specific disposition thereof. In subsequent parts of the will, he referred to the " estate herein given in trust to the use of said " church; provided that in case the minister, wardens, vestrymen and proprietors of pews therein would not accept " of this my donation, which I intend for the benefit of said church, then I hereby give and bequeath all hereinbefore given to and for the benefit of said " church to another church, upon the same trusts; and otherwise referred to the devise as a donation to said church. A surplus afterwards arose, which eventually became very large. *Held,* that the church is entitled to this surplus, for its own use.

INFORMATION filed by the attorney general at the relation of the Convention of the Protestant Episcopal Church in the diocese of Massachusetts, and of two poor persons of Christ Church, against the rector, churchwardens, vestrymen and corporation of Trinity Church, and certain persons " claiming to be the minister and wardens of King's Chapel," and certain other persons " claiming to be vestrymen of King's Chapel," and the religious society " claiming to be the proprietors of pews in King's Chapel," and the rector and wardens of Christ Church.

The information alleged, amongst other things, that William Price of Boston was until his death in 1771 a firm believer in the truths of Christianity as held and declared by the United Church of England and Ireland; that he contributed to the expense of building Christ Church in 1722, Trinity Church in 1732, and of rebuilding King's Chapel in 1753; that he was a warden or vestryman of the first two churches for many years, and owned pews in all three, and was a constant attendant at King's Chapel from its rebuilding till his death; that these churches were all of the Church of England, and were the only churches of that denomination in Boston during his life; that he was desirous of providing for all the poor of that denomination in Boston, and for the vindication and promulgation of its doctrines and discipline; that he was possessed of a certain estate on Cornhill in Boston which then would not probably, in the hands of trustees, yield a greater annual income than would leave a surplus of about twenty pounds sterling, after keeping the estate well in repair and otherwise in good condition, and providing a fund for permanent repairs and rebuilding, when necessary; that he made his will on the 30th of November 1770 which, after making provision that the estate should be occupied by his wife and nieces during their lives, proceeded as follows:

" ITEM, After the decease of my said wife Sarah Price and my nieces Sarah and Margaret Creese I give and bequeath to the rector and churchwardens of King's Chapel so called in Boston aforesaid and to their successors in said office in trust forever my said brick house with the lands buildings appurtenances and privileges thereunto belonging as the same is now inclosed and occupied by me, for the uses intents and purposes following viz: That there shall be paid yearly out of the rents and profits of my said house and land and premises after the death of my said wife and nieces the sum of forty shillings sterling to the last mentioned church forever by the wardens of said church for the time being which said annual payments of forty shillings sterling shall be kept entire as a fund for said church and be placed out at interest upon good security, and the interest only appropriated to the use of said church forever

as the wardens and vestry of said church for the time being shall from time to time vote and direct and in no other way or manner. And the churchwardens of the same church for the time being out of the rents of said house and appurces shall pay sixteen pounds sterling annually for the support of a course of sermons to be preached annually in said King's Chapel in Lent in manner as is hereinafter directed and upon the subjects hereinafter named and that the churchwardens of the same church for the time being pay forty shillings sterling annually out of the rents and profits of my said house & appurces for the use of the poor in manner also as is hereinafter mentioned. That the rector and churchwardens of said church for the time being shall place the remainder of the money annually arising from the rents and profits of my said house and appurces at interest upon good security to be called in as there may be occasion for repairing enlarging or rebuilding my said house or any part of the premises, and also for keeping my tomb which is under Trinity Church aforesaid in good and decent repair."

The will then specified in detail by whom the sermons should be preached and the other services conducted, and that the sermons should be upon the following subjects :

" 1st sermon on Ash Wednesday upon the duty, usefulness and propriety of fasting and abstinence, or upon repentance, or faith, or hope, or charity, or christian morality.

" The 2nd sermon on the second Wednesday in Lent to be against atheism or infidelity, or in defence of the divinity or miracles of our blessed Savior.

" The 3rd sermon on the third Wednesday in Lent, the subject, the Catholick Church, or the excellency of the Christian religion.

" The 4th sermon on the fourth Wednesday in Lent to be a vindication of the Church of England as to government doctrine or discipline, or a discourse against heresy or schism, enthusiasm, or hypocrisy, or the duty of obedience to kings and lawful authority from all persons professing Christianity.

" The 5th sermon on the fifth Wednesday in Lent against error and superstition, particularly those of the Church of Rome.

" The 6th sermon on the sixth Wednesday in Lent, or

detraction or restitution, or on contentment and resignation, or on preparation for death.

" The 7[th] sermon on the seventh Wednesday in Lent, on baptism, or confession, or absolution, or on the duty of publick worship.

" The 8[th] sermon on Good Friday on the passion and death of Christ, or of the nature, necessity and advantages of the holy communion."

Then, after providing for the payment of the preachers, in detail, the will proceeds as follows : " It is my desire that on every of the eight days upon which a sermon shall be so preached as aforesaid, there shall be a contribution after sermon for the poor of each of the three churches herein before-mentioned, collected at the church doors or otherwise. And I hereby order and direct the churchwardens for the time being of King's Chapel aforesaid at every such contribution to pay five shillings sterling out of the rents or incomes of my said house toward$_s$ the said contribution, in all forty shillings sterling annually, and on every Good Friday after sermon in the afternoon the rector or minister with the wardens of said King's Chapel for the time being shall divide the said forty shillings, and what else shall be collected for the poor aforesaid upon the several days before mentioned, one third part to themselves for the use of the poor of said chapel, one third part to the minister and wardens for the time being of Christ's Church for the use of the poor of the same church, and the remaining third to the minister and wardens for the time being of Trinity Church for the use of the poor of said church, and I direct that said wardens of each church then attend to receive the same."

The will also contained the following provisions :

" I recommend to the rector of said King's Chapel and wardens for the time being that they make the best improvement of my said house and appur[s]. they can when it shall come into their hands, by letting the same by written lease always being careful that the lessee is bound by covenant to pay the rent half yearly, to pay all taxes of said house and to keep and leave the said house and appur[ces] in good repair. And if at any time there

shall be a greater sum arising from the rents and profits of my said house and appurces than shall be sufficient to discharge the said twenty pounds annually hereinbefore given, and to keep said house and appurces in repair, and if need be to rebuild the same, and also to keep my tomb in repair as aforesaid, then and in that case I order such surplusage to be put out at interest by the minister and wardens for the time being of said King's Chapel.

' I will and hereby direct that all the business which relates to my estate herein given in trust to the use of said King's Chapel shall be done by a vote of the vestry of said church, and no vote shall be of any force, unless there be present the minister if in health and in town, the wardens and at least one half of the gentlemen of the vestry, such meetings to be called by the wardens for the time being of said chapel, giving due notice thereof in writing or by printed summons."

" In case the minister, wardens, vestrymen, and proprietors of pews for the time being of said King's Chapel will not accept of this my donation which I intend for the benefit of said church then I hereby give and bequeath all herein before given to and for the benefit of said King's Chapel to the minister and churchwardens of Trinity Church aforesaid, in trust in the same manner and under the same provisos limitations and conditions that it is herein before given to the minister and churchwardens of said King's Chapel. But if the minister and churchwardens of said King's Chapel will accept of this my donation they shall under their hands certify to the minister and wardens of Trinity Church aforesaid for the time being such their acceptance in the manner following viz.$^t$ ' We do accept the donations of William Price agreeable to his last will and testament, and will as far as possible strictly fulfil the said will in every part thereof.' . . . . And I hereby appoint all the gentlemen of the vestry of said church, for the time being, my trustees forever, to inspect and if need be to call the minister and wardens for the time being of said King's Chapel to account for all or any of the income of my said estate, and to see the same is punctually employed for the uses and purposes herein before mentioned and in no other manner."

The information further set forth that William Price died in 1771, and his said will was duly proved ; that he thereby did give and appropriate said devised premises, and did establish a public, pious and charitable use and trust, to promote the glory of God, the public preaching of the gospel, the vindication and promulgation of the doctrines, government and discipline of the Church of England, and the relief of the poor of the churches of the Church of England in Boston ; that the Church of England is and ever has been an Episcopal Church, and claims to have a ministry descended in direct and uninterrupted succession from the apostles of Jesus Christ, with exclusive authority to transmit their power and mission to others ; that the provincial churches were under the supervision of the bishop of London ; that the testator was within its communion, a firm believer in and warmly attached to its doctrines and discipline, and especially in the Trinity, the true and perfect divinity of the person of Jesus Christ, his miraculous incarnation and expiatory sacrifice and atonement, and the divine institution and perpetual maintenance of one catholic and apostolic church, which doctrines are and ever have been held by the Church of England to be essential truths of Christianity ; that the Protestant Episcopal Church of the United States is a branch of and successor to the Church of England ; that about the year 1787 certain proprietors of pews in King's Chapel separated from and ceased to be connected with the Church of England, or Protestant Episcopal Church of the United States, and without the consent of any bishop, elected and pretended to institute another rector of King's Chapel, one James Freeman, who had been refused ordination by the bishop then having episcopal jurisdiction of the Episcopal Churches of Massachusetts ; that King's Chapel has ever since continued to be used as and for a congregational or independent meeting-house ; that the persons occupying the same before 1787 departed from the faith and doctrines of the Church of England and became what is commonly called a Unitarian society, and have ever since continued to use said chapel as a Unitarian meeting-house, denying the various Episcopal doctrines aforesaid ; that the religious society

now occupying and claiming to be proprietors of King's Chapel are not and do not claim to be a Protestant Episcopal Church, and are not entitled to any part of the income or funds arising out of the public charity and trust established by the testator; that the minister, wardens, &c. of King's Chapel never accepted the donation of William Price, or certified their acceptance thereof to the minister and wardens of Trinity Church; that the last survivor of those to whom a life interest in the devised estate was given died in 1809; that in 1813 James Freeman claiming to be the rector, and certain persons claiming to be the wardens of King's Chapel, entered into possession of said devised estate, by virtue of a writ of possession; that having thus obtained possession, they did not support the sermons, and applied only a small portion of the rents to the poor of the Episcopal churches, but appropriated most of the same to the support of said Freeman, and the promotion and maintenance of Unitarian doctrines and worship; that in 1824 the rector and churchwardens of Trinity Church took steps to obtain possession of the premises, and recovered verdict and judgment therefor in 1828, and entered into possession thereof, and have ever since continued to hold and occupy the same, as the lawful devisees and trustees under said will; that the premises have greatly increased in value, so that the rents and income thereof are many times greater than at the date of the will; that the present trustees have perverted the trust reposed in them, and appropriated the greater share of the income to pay the expenses of Trinity Church, and to the maintenance and support of the Unitarian society calling themselves the Proprietors of King's Chapel, and have not kept the buildings in repair, or invested the surplus income, or rendered any account of the expenditure for sermons, and for the poor, and have refused to comply with the request of the Convention of the Episcopal Church for a conference with their committee, or to give them any information concerning said income; and that Christ Church have refused to become relators to this information.

The prayer was that the public charity and trust declared and created by the will might be established and carried into

execution ; an account of the income taken ; the trustees ordered to keep the buildings in repair, and pay no part of the income to the society or persons now occupying King's Chapel, but invest the surplus as a permanent fund, to be appropriated as follows 1. For supplying any deficiency in the annual income, below £20 ; 2. To keep the estate in repair ; 3. To be expended on the objects of the charitable purpose of William Price, declared by his will, either in the proportions expressed in the will, or in such proportions and on such a scheme as the court should adopt to carry out his pious and charitable intentions, or at the discretion of the trustees, for the objects of the testator ; 4. If on the scheme adopted by the court a larger sum should be appropriated to the support of the poor than would be sufficient for the poor of Christ Church and Trinity Church, then that it might be divided among all the Episcopal churches in Boston ; or that the sermons should be printed ; and for other and further relief.

The rector and wardens of Christ Church made no appearance, and as to them the information was taken *pro confesso.* The other defendants appeared and filed answers, setting forth various facts, the material ones of which were incorporated into an agreed statement of facts, by which the parties agreed, amongst other things, as follows :

King's Chapel was the only church of the Church of England in Boston until 1722, when Christ Church was erected. Price contributed to the expense of its erection, and from 1726 to 1743 was a warden or vestryman of it. During his life, there were no other churches of that denomination in Boston except King's Chapel, Trinity Church and Christ Church, in all of which he owned pews. When Price made his will, King's Chapel was owned by a body politic, existing by prescription, and known as the Proprietors of King's Chapel, the pews therein being owned by individuals, each of whom was a member of the corporation ; and this organization was in communion with the Church of England, as then by law established. Upon the evacuation of Boston in 1776 by the British troops, Dr. Caner, the rector, went with them, taking the church registers, the vestments and plate, and part of the records of the vestry. The

congregation was dispersed, and in 1777 the use of the chapel was granted, by those proprietors of the pews who remained, to the congregation of the Old South Church, who occupied it for about five years. In September 1782, the wardens of King's Chapel who had been elected that year invited Rev. James Freeman to officiate as reader, and in April 1783 he was chosen pastor by said proprietors, who consented to such alterations of the service merely as the political state of the country required. In 1785 alterations in the liturgy were made, which consisted chiefly in the omission of the doctrine of the Trinity; and the chapel has never been occupied since by any society in communion with the Church of England or the Protestant Episcopal Church of the United States.

The action referred to in the information was brought by the rector and churchwardens of Trinity Church against Jonathan Stodder and another, who held the devised premises as tenants of the rector and wardens of King's Chapel; and the latter persons were admitted to come in and aid in the defence of the action. In relation to this action, it appeared by the deposition of William H. Gardiner that it was brought by him as junior counsel for the demandants, and that his associates were Charles Jackson, Daniel Webster, Benjamin Gorham and Samuel Hubbard, as retained counsel, and William D. Sohier and Samuel D. Parker, who, as pewholders, offered their services gratuitously. The counsel for the tenants were William Prescott, Daniel Davis, William Sullivan, Charles P. Curtis and William Minot. The suit was commenced in 1824; carried through the common pleas on a judgment on demurrer; entered in the supreme court; tried before the jury in January 1825; a formal verdict rendered for the tenants, subject to the opinion of the whole court; delayed till March 1827, when it was argued before the full court; and disposed of by them, in 1828, by referring to the determination of a new jury the question whether or not there had been an acceptance by Dr. Caner, the rector who left Boston in 1776. Evidence was offered to show that in 1789 and in 1809 a formal acceptance by the rector and wardens of King's Chapel had been made of the donation under the will, but a

majority of the court were " not of opinion that they were in a condition to make an acceptance," and Mr. Gardiner testified that it was perfectly well known at the bar at the time that the court were equally divided upon the point whether the society, as it existed in 1789 and 1809, were competent to make such acceptance. Thereupon, and, according to the recollection of Mr. Gardiner, under a suggestion from the court, a compromise was entered into, in 1828, by the advice of all of the counsel on both sides, by which it was agreed that a general verdict should be taken for the demandants, who should hold the estate and execute the trust, without any participation or interference on the part of the minister, wardens, vestrymen or proprietors of King's Chapel ; the income of the estate to be applied to defray the expenses of the trust, and to pay necessary repairs, and one half of the residue to be paid over to the proper persons authorized to receive it by the vestry and proprietors of pews of King's Chapel. This compromise was carried into effect, and the action disposed of accordingly in November 1828.

The rents and income of the devised estate, received by King's Chapel from 1814 to 1828, amounted to $14,662.16 ; the expenses, $4537.53 ; and the residue was applied to their general expenses. From 1829 to the present time the annual rents received by Trinity Church have amounted to $3420, and the annual expenses to $306 ; and one half of the balance has been paid to King's Chapel, and the other half applied to the general expenses of Trinity Church. From 1814 to the present time, $96.80 has been annually applied in payment of the £20 mentioned in the will ; and no further sum has been paid or appropriated for the preaching of sermons or for the poor, specially from this fund. The valuation book for 1771, which it was agreed might be referred to, if competent, showed that the " annual worth of the real estate, without any deduction for more than ordinary annual repairs," was £40.

*R. H. Dana, Jr.,* ( *C. H. Hill* with him,) for the relators. Three out of the four trusts declared by the testator were charitable uses, within *St.* 43 Eliz. *c.* 4. This is true of the course of sermons ; *Thetford School,* 8 Co. 130 *b ; Earle* v. *Wood,* 8 ·

Cush. 415, and cases cited; *Sohier* v. *Wardens, &c. of St. Paul's Church,* 12 Met. 250, and cases cited; *In re Michel's trust,* 28 Beav. 39; *Pember* v. *Knighton,* cited in Duke, (Bridgman's ed.) 381; the alms to the poor; *Witman* v. *Lex,* 17 S. & R. 88; the investment of the residue, as a fund to secure the permanence and increase of the charities; *Attorney General* v. *Parsons,* 8 Ves. 186; *Gregory's will,* cited 4 Co. 114; *Attorney General* v. *Craven,* 21 Beav. 392; *Case of Elmeley Lovett,* cited in Duke, (Bridgman's ed.) 359. The intent of the testator is clear, to appropriate the whole income of the estate, with the exception of a small portion distinctly carved out, to the charities therein declared; and to give nothing to the church whose officers are trustees, beyond the portion thus carved out, and the incidental benefits to be derived from having its house of worship the place for the public preaching forever of a course of sermons, and its officers the almoners of his charity for the poor. The uses and purposes for which the income of the devised estate is to be employed are four, namely, 1. A special fund for the use of the church whose officers are made trustees. 2. A course of sermons yearly forever by ministers of the Church of England, to be paid for their services. 3. Alms for the Episcopal poor of Boston. 4. Repairing, enlarging and rebuilding upon the premises, and repairing the testator's tomb. As to the course of sermons he gives particular direction, the subjects of them manifesting his attachment to the doctrines and discipline of the Church of England. These various trusts were clearly intended to exhaust the whole income. He mentions no other use afterwards, and ends with repeating that all the income of the estate is to be punctually employed for these uses and purposes, and in no other manner. All the intermediate provisions are mere details, for the more convenient and safe administration of the trusts. A specific annual sum is given, to create a fund for the church whose officers are trustees. The gift of this sum and the expression of the use exclude the conclusion that any further portion of the income was intended for the use of that church. This construction is justified by the considera tion that the trustees were to pay the required sum only out of

the income of the devised estate ; and the payment of it was not imposed on them as a condition of accepting the devised estate.

This devise has the four characteristics, either of which has been held sufficient to indicate an intent that the whole surplus income should go to the charity. 1. A manifest intent to devote the whole income to the trusts declared. *Thetford School*, 8 Co. 130 *b*. *Attorney General* v. *Burgesses of Warwick*, 17 Rep. of Charity Commissioners to House of Commons, 473, 480. *Arnold* v. *Attorney General*, Show. P. C. 22; S. C. Duke, (Bridgman's ed.) 591. *Attorney General* v. *Sparks*, Ambl. 201 ; S. C. 1 Collect. Jur. 452. *Mercers' Co.* v. *Attorney General*, 2 Bligh, (N. S.) 179, 180, 182. *Attorney General* v. *Painter-stainers' Co.* 2 Cox Ch. 51. *Attorney General* v. *Wilson*, 3 Myl. & K. 362. *Mayor &c. of Southmolton* v. *Attorney General*, 5 H. L. Cas. 1, 32. *Mayor &c. of Beverley* v. *Attorney General*, 6 H. L. Cas. 310, 318, 330, 331. *Attorney General* v. *Dean & Canons of Windsor*, 8 H. L. Cas. 369, 405, 432. 2. Specific appropria-tions, supposed by the donor to exhaust, and in fact exhausting, the whole income at the time. *Thetford School*, 8 Co. 130 *b*. *Attorney General* v. *Coopers' Co.* 3 Beav. 34, 35. *Attorney General* v. *Christ's Hospital*, 4 Beav. 73. *Magill* v. *Brown*, Brightly, 389. 2 Story on Eq. §§ 1178, 1181. 3. The appropriation of a certain sum to the trustees, in the first instance, without restrict-ing the nature of its use. *Arnold* v. *Attorney General*, Show. P. C. 22. *Cordell* v. *Noden*, Pre. Ch. 12. *Farrington* v. *Knightly*, 1 P. W. 544, 550, *n*. *Nisbett* v. *Murray*, 5 Ves. 149. 4. Im-posing on the *cestuis que trust*, and not on the trustees, the risk of loss, in case of a decrease in the income. *Attorney General* v. *Johnson*, Ambl. 190. See also cases heretofore cited under 1.

The testator's intent to extend the influence of the Church of England, and to assist the Episcopal poor, clearly appears. No church, by changing its religious faith, can affect express charita-ble trusts upon which the church or its officers hold property. Devoting a part of this fund to the ordinary uses of a Unitarian society is a breach of trust. *Princeton* v. *Adams*, 10 Cush. 132.

The compromise of 1828 cannot affect this case, because the action then pending affected the legal title only; because an

agreement between two persons claiming the title of trustee cannot affect the rights of *cestuis que trust;* and because the compromise was not assented to by the attorney general, nor confirmed by a court of chancery. The clause of the will appointing visitors does not oust this court of jurisdiction. Time affords no sanction to the breaches of trust. *Attorney General* v. *Master of Brentwood School,* 1 Myl. & K. 394. *Attorney General* v. *St. Cross Hospital,* 17 Beav. 469. *Attorney General* v. *Rochester,* 5 DeG., Macn. & Gord. 813. *Prevost* v. *Gratz,* 6 Wheat. 497. The statute of limitations is no bar to this information. [A further argument as to the remedies for the alleged breaches of trust is omitted.]

*I. F. Redfield,* for Trinity Church. 1. The provision for the poor of £2 a year is too insignificant to amount to a charity. 2. In the present case, the whole income is not devoted to charity, and the testator gives no scheme which exhausts the whole income. Therefore the devisees in trust take the surplus beneficially. This is the result of numerous authorities cited in Tudor on Charitable Trusts, 238, 239. See, especially, *Attorney General* v. *Master &c. of Catherine Hall,* Jacob, 381. After assuming the trust, the trustees were bound to perform the conditions; and where a trustee bears the loss by decrease, he is entitled to the gain by increase. *Attorney General* v. *Christ's Hospital,* 1 Russ. & Mylne, 626. *Attorney General* v. *Trinity College,* 24 Beav. 394. *Attorney General* v. *Mayor of Bristol,* 2 Jac. & Walk. 318, 331. *Attorney General* v. *Smithies,* 2 Russ. & Mylne, 717. *Mayor &c. of Southmolton* v. *Attorney General,* 5 H. L. Cas. 1. So if the donee is intended to be benefited, he takes the surplus. *Mayor, &c. of Beverley* v. *Attorney General,* 6 H. L. Cas. 310. So if a fund is given to persons, to secure through them certain specified benefits to different objects of charity. *Attorney General* v. *Dean & Canons of Windsor,* 6 Jur (N. S.) 833 ; S. C. 8 H. L. Cas. 369. *Attorney General* v. *Bra ₌en Nose College,* 2 Clark & Fin. 295. Thus, upon the English authorities, these defendants are clearly entitled to the surplus. 3. If the compromise was valid, then the payment of one half the surplus to King's Chapel is valid. After so long a time, this

compromise will not be disturbed. 4. The direction to invest £2 for accumulation is void. *Williams* v. *Williams*, 4 Selden 525. 5. A donation for the benefit of a private religious society is not a public charity. *Attorney General* v. *Merrimack Manuf Co.* 14 Gray, 586. *Attorney General* v. *Federal Street Meeting House*, 3 Gray, 1, 52.

*B R. Curtis*, for King's Chapel. The main inquiry in this case is, what was the intention of the testator? The leading and general intention, as displayed in various parts of the will, was to benefit King's Chapel. To carry out this intention, he availed himself of the provision then existing, (Anc. Chart. 605, 606,) creating churchwardens so far bodies corporate as to enable them to take grants for the use of their own church. This *quasi* corporation could receive donations for this church, or the poor thereof, but not for charitable uses generally. The testator provides for the use of a portion of his gift in three modes, which he deems beneficial to King's Chapel; appoints the vestrymen visitors, expressing the hope they will not think it hard 'o serve said church," clearly not referring simply to the £2; .d directs them to see that all of the income is employed for the uses mentioned, and in no other manner; that is, as to the surplus, " to the use of King's Chapel." He contemplated such surplus, expressly referred to it in his will, and directed how it should be employed. He intended it to be for the general benefit of King's Chapel, and not to be applied to the increase of the sums directed to be paid to the special uses, or to be devoted to charity generally. An examination of the different provisions of the will shows this plainly.

This construction was placed on the will contemporaneously with the inception of the trust, and has been acted on for more than fifty years. *Attorney General* v. *Parker*, 3 Atk. 576. *Hadley* v. *Hopkins Academy*, 14 Pick. 267. This action was under the sanction of the visitors, and this construction of the will formed the basis of a compromise, nearly forty years ago, which was advised by the ablest counsel in the Commonwealth and approved by this court. If, then, this surplus was given to King's Chapel, or Trinity Church, for its own use, this information

cannot be maintained, even if there has been a breach of trust. *Parker* v. *May*, 5 Cush. 336. *Attorney General* v. *Fed eral Street Meeting-House*, 3 Gray, 49. *Attorney General* v *Merrimack Manuf. Co.* 14 Gray, 604. To create a trust of the exclusive character claimed, the terms used must be so clear as to leave no doubt. It is true that the testator was a member of the Church of England. But this is not enough. It does not follow that he thought he had attained to all light. Besides; he gave his donation to a church which had a right to change its doctrines, and he must be presumed to be aware that it might do so. Yet he imposed no conditions. And there is no one duty prescribed which could not conscientiously be performed in a Unitarian church. The subjects for the sermons are always prescribed in the alternative; and it might as well be argued that because the testator has set down as one subject the duty of obedience to kings, nobody can execute his directions since the Revolution. There is, therefore, nothing in the will inconsistent with the construction here contended for.

*S. Bartlett*, for Trinity Church and King's Chapel. It is unimportant to determine whether the specified objects to which some portion of the fund was devoted are or are not public charities, because the whole of the relators' case must rest upon the assumption that all of the objects are charitable, and that the whole surplus must go to those objects; and it is conceded that one of the objects is not charitable. It is also unimportant to determine whether or not the surplus has been properly employed, provided it is found that it belongs to King's Chapel or Trinity Church. If it belongs to us, the attorney general cannot disturb us, however we may deal with it.

Leaving out those elements, three questions arise. 1. Does the will bestow on King's Chapel this estate, charged with certain burdens? In regard to this, the argument has been exhausted already. 2. If not, if the estate was given to them as trustees, was it under such circumstances that any surplus belongs to them *qua* trustees? Assume that they took the estate in trust, out of the rents to pay to the objects specified. t is quite material, throughout this inquiry, to remember tha·

the testator contemplated a surplus. Under these circumstances, it is an inflexible rule of law that such surplus goes to the trustees. The *Southmolton case*, the *Beverley case*, and the case of the *Dean & Canons of Windsor*, before referred to, contain all the former learning on this subject. 3. If these considerations do not dispose of the case, the inquiry remains, whether the estate results to the heirs, or is to be apportioned among the various objects, or such of them as are public charities.

In no case referred to by the relators did the testator point to a surplus, and leave it undisposed of. It has been said that the appropriation of a certain sum to the trustees, to wit, £2, shows that no more was intended to be given to them. If the testator had declared this sum to be given to them as a compensation for the discharge of their duty, it would afford some foundation for this argument. It has also been said that if the charities must lose, in case of depreciation, they ought also to take the surplus. But the estate was given on condition. The sums to be expended are not payable absolutely, but out of the rents. See *Attorney General* v. *Trinity College*, 24 Beav. 395. The true principle would seem to be, that if the donees were to lose all, and the special trusts to take the whole in case there should be only sufficient to discharge them, then, in case of a surplus, the donees should take it.

*E. D. Sohier & C. A. Welch* were with the counsel for Trinity Church.

*Dana*, in reply. There is no doubt that the provision for the poor and for the preaching of sermons constituted two good public charities. This is a case where, after devoting the rents to the objects specified, there was no known, fixed surplus, and the testator distributed what he thought the estate would safely yield, knowing of course that there might be a possible increase or a possible decrease. The devisees were public functionaries, indifferent to the testator ; and in such a case there is no inflexible rule of law that they should take all the increase. It is in each case a question of construction.

In the case of the *Dean & Canons of Windsor*, lands were given to them on condition that they should do certain things

and make certain expenditures, and no precise provision was made for them, but in express terms the residue was given to them. On what ground could it be hoped that the process in that case could be maintained ? In the *Beverley case*, there was a gift of lands declared to rent at £47 to the town of Beverley, which was to pay certain sums ; the surplus, being £7, was given to Beverley. There was a separate provision that none of the poor children referred to should receive more than a certain sum. That was a fair question of construction. In the *Southmolton case*, land was given to the mayor, &c. of Southmolton, they to pay £40 to a school ; and the surplus was given in terms to them, the grantor estimating it at about £60. Each of the above was a clear case, depending on its own circumstances.

In the present case there was a gift outright of £2 to the · devisees. They might or might not be beneficiaries. They might be mere managers of a charity. In many cases the gift of a sum outright is considered as showing that the devisee was not to have the residue. In this case the founder was not dealing with a recognized or known surplus. He could not then anticipate the present increase. He makes his scheme upon a foundation of £20, contemplating a small probable surplus, and a possible deficit. Where arises any presumption that it is the corporation, rather than the poor, that shall have the increase ? It is true that the testator says his donation is for the benefit of King's Chapel. But he also sees that perhaps they will not take it. This would lead to the inference that it was not a gift outright, but a gift *cum onere.* The argument derived from the omission to dispose of the whole of the rents and profits is directly antagonistic to the view taken by Lord Lyndhurst, in *Mercers' Co.* v. *Attorney General*, 2 Bligh, N. S. 179. The argument that the churchwardens were a corporation for only a limited purpose, and therefore the testator could not have intended to create a charity, is answered by *Sohier* v. *Wardens &c. of St Paul's Church*, 12 Met. 250. These purposes were sufficiently cognate to their general purposes. At the time of the compromise in 1828, no question respecting the execution of these

trusts was before the court. The only question was, who were the proper trustees.

DEWEY, J.* The questions in the present case arise upon the wil of William Price, made in 1770, devising to the rector and churchwardens of King's Chapel, and to their successors in office, in trust forever, certain real estate, situate in Boston, for certain uses and purposes particularly set forth in the will, and which estate so devised, upon non-performance of certain conditions named therein as to the acceptance of the same, was by the further provisions of the will devised to the minister and churchwardens of Trinity Church, upon the like conditions and for the like trusts. Among these trusts charged upon the property which was thus devised, and from the income of which payments were required annually to be made by the devisees, there are three which are particularly the subject of consideration :

1. " That there shall be paid yearly out of the rents and profits of my said house and land and premises after the death of my said wife and nieces the sum of forty shillings sterling to the last mentioned church [King's Chapel] forever by the wardens of said church for the time being which shall be kept entire as a fund for said church and be placed out at interest upon good security, and the interest only appropriated to the use of said church."

2. " The churchwardens of the same church for the time being out of the rents of said house and appurtenances shall pay sixteen pounds sterling annually for the support of a course of sermons to be preached annually in said King's Chapel," under certain regulations prescribed in the will.

3. " That the churchwardens of the same church for the time being pay forty shillings sterling annually out of the rents and profits of my said house and appurtenances for the use of the poor in manner also as is hereinafter mentioned."

The two latter gifts are clearly of the nature of public charities, while the first seems to be a private gift or charity, to the use

---

* BIGELOW, C. J. did not sit in this case.

of King's Chapel. The second and third gifts are of a character to justify the intervention of the attorney general to secure their due execution, if there has been a failure in that respect.

Assuming these to be public charities, the inquiry is as to any neglect or want of proper discharge of duty by the devisees, as to any funds given to these objects. The case, as presented by the bill, answer and statement of facts, shows that as to the specific provisions of this will, directing certain payments to be annually made in behalf of these charities, the will has been fully carried into effect. The sums ordered to be thus annually paid have been paid. The only alleged neglect of duty in which the relators have any interest is the failure to invest and apply properly the surplus income that has remained, after discharging the specific payments required by the will. This is the whole case, and the whole subject of inquiry arising on this bill. The relators assume that such surplus was, by force of this will, appropriated to public charities, and that it ought to have been regularly invested as such, and the income appropriated to an enlargement of the sums directed to be paid to the public charities named, and, if the same amounted to a greater sum than could be usefully applied for those purposes, that the same be applied to the support of the poor of other Episcopal churches in Boston. The defendants, on the other hand, insist that such surplus enures to the benefit of the church named as devisee in trust, being originally given to King's Chapel, and, in case of their not accepting the same, then to Trinity Church. It is not contended that there is any gift of the surplus, as such, in direct terms; but it is insisted that it results from the whole will and declared purpose of the testator, applying to them the well settled principles of law and equity governing such cases. As a distinct proposition, it is further contended that, in the absence of sufficient evidence of the particular purpose declared on the face of the will to give the surplus income to King's Chapel, yet the same effect must result, inasmuch as, no gift over of a surplus being found in the will, the devisee to whom the estate was given charged with certain specific trusts would take the same.

In behalf of the relators it is urged that where there is a man= ifest intention on the part of the testator to devote the whole property to public charity, it would carry the whole income, including any surplus not directly devised, and the same should be appropriated to the charities named, notwithstanding certain specific devises requiring the payment of particular sums in aid of such charities. Numerous authorities have been cited bearing upon this point, and apparently sanctioning it, as a rule applicable to cases where no controlling circumstances require a different result. But upon their application to the present case the parties are at issue, and the case has been very fully and ably presented upon the briefs, and by the extended argu- ments of the counsel of the respective parties, and all the learn- ing of the books bearing upon the questions here raised has been brought to our notice. To restate the cases, or enter upon a minute review of them, would extend this opinion beyond its proper length. Upon the great and leading principles governing this class of cases, there will, we apprehend, be found no great discrepancy, and the difficulty here and in other cases lies in the proper application of those principles to the facts of the particular case under consideration.

Granting to the relators their premises, and the conclusions they would have us adopt properly follow. If we found upon the face of this will that it was the clear intention of the testator that this whole estate should be devoted to certain public char- ities named by him, it would well authorize the relators to insist that the surplus income, after reserving the amount necessary to pay the particular sums named, should be invested, and the income thereof applied, either in augmentation of the particular bequests named in the will, or to other charities of the like general character. But we do not find this fact to exist. The testator did not so declare, either in direct terms, or by any provisions in the will leading necessarily to that inference. Nor does the present case fall within that other class of cases, cited on the part of the relators, where, although on the face of the will the whole income is not devoted to public charity, yet upon applying to the case the surrounding facts, such inference of an

entire appropriation may be properly made; as where an estate had a fixed rent, and the testator in his specific bequests had exactly appropriated the entire sum received therefrom, making no allusion to any possible surplus, and there being nothing either in the will or in the surrounding circumstances indicating any intent to benefit any other party. Of the cases upon this point, the leading one is that of *Thetford School,* 8 Co. 130 *b.* But the court there found that it was the manifest intention of the testator to appropriate the whole estate to certain public charities named. In the present case no such inference can be drawn from the will, nor can it be assumed that a surplus was unexpected by the testator. It was directly referred to, and although not directly given to any one as a gift of the surplus income, yet provisions are made by the testator requiring the rector and churchwardens of the church named as devisees to place such surplus annually at interest, and directing to some extent occasions on which it was to be used.

It is urged, as a further ground of objection fatal to maintaining the position taken by the defendants as authorizing them to succeed to the whole estate and income thereof after discharging the two public charities charged thereon, that the fact that a legacy of £2 annually was directly given to King's Chapel from the income of this estate by the testator excludes the inference that any further portion of the income was intended for the use of that church and society. This objection is certainly entitled to be considered, in searching for the proper construction to be given to this will. It is a fact entitled to its proper influence, and to be weighed with the other portions of the will. It might be that the testator intended to secure in any event a certain smal. donation to the church with which he was connected, to be invested annually for the use of the church, and to make that particular donation to abate only in common with the other specific bequests, in case the income was not large enough to discharge the entire sums. Had there been in terms a genera. residuary clause in the will in favor of King's Chapel, this specific donation clearly would not have avoided it. So here if we find upon the whole will that King's Chapel occupies the

place of residuary devisee of this estate thus given, then the specific donation to them of the £2 does not deprive them of their rights to so much of the income as may exceed the £20 specifically devised.

In the case of a specific bequest to an executor, as in some of the cases cited, it would be properly held as a reason why he should not take the surplus, in cases where otherwise he would formerly have been so entitled. So if the estate were given in trust to a private individual, to be held for certain declared uses and purposes, among which was the payment, out of the rents and profits, of certain sums of money to various persons, and among others to the devisee in trust, and no such relation existed between him and the testator, and no declaration of any purpose to benefit him beyond the specific legacy to him, or to show an intended bequest to him of the surplus income, the fact of such specific legacy might have a controlling effect upon his claims to hold the surplus.

The relators urge upon us the consideration that, as these public charities may be decreased by a diminution in the income to an amount less than the stated sums required to be paid by the will, they should also have the benefit of the increase arising from an enlarged income. The principle is often stated in the cases cited by the relators. It is very sound, where the case shows that the whole income of the estate was by the testator appropriated to public charity, as was the case of the Thetford School, and other cases referred to, but can have no effect where the court find from other parts of the will that the testator has not appropriated the whole income to public charity. One of the counsel for Trinity Church denies that the payment of the sums given to public charities in this will does depend upon the fact of there being a sufficient sum received from the income by the trustee, and insists that Trinity Church has become bound, by accepting the devise in trust, to pay these sums at all events; and raises an argument thereupon, supported by numerous authorities, that such obligation thus assumed does of itself operate to vest in the devisees the surplus income. As it seems to us. the devisees in trust have not absolutely assumed

to pay to these public charities the full sums named, unless the income of the estate devised in trust produces so much; and the case to be considered is that of an appointment or direction to pay the sums out of the annual rents and income of the estate.

Cases have been cited on the part of the defendants having certainly some tendency to sustain the rights of Trinity Church to the entire surplus income, even in the absence of any particular purpose to that effect expressed on the face of the will. Thus in the case of *Mayor &c. of Beverley* v. *Attorney General*, 6 H. L. Cas. 310, it was held that where a testator gives to A. an estate or rents, in trust to make certain payments to charities, and refers to the matter of a surplus, and does not specifically bequeath the same, if there should be an increase in the profits of the estate A. will be entitled, after making the specific payments required by the will, to take the surplus. The rule upon the subject, as stated in Tudor on Charitable Trusts, (2d ed.) 230, is thus : " Where, however, there is no general intention shown of devoting the whole income, or if the existing income is not given to charitable purposes, and particular payments only are directed to be made to certain charitable objects, the devisees in trust will take the surplus beneficially." In *Attorney General* v. *Dean & Canons of Windsor*, 8 H. L. Cas. 405, Lord Cranworth says: " Where the founder of a charity conveys lands to persons for the purpose of securing through their agency certain pecuniary benefits of specified amounts to various objects of charity, and the sums so devoted to charity do not exhaust the whole revenue, there is no rule of law which says that the surplus rents may not have been intended as bounty to the persons in whom the estate has been vested."

But we forbear to enter into a more elaborate review of the various cases cited upon this point, inasmuch as, in the view we have taken of the present case, there are controlling expressions found in the will itself, strengthened by the facts and surrounding circumstances legitimately connected with it, that will require us to hold that the gifts in this will to public charities are limited to the sums therein stated, and that no case is shown

requiring the application of the surplus income to an augmentation of those special charities, or to any new scheme of public charities to be prescribed by this court. The strong indications from the leading cases cited are, that we are upon questions of this nature to regard the intention of the testator. " What were the intentions of the testator, legitimately to be collected from the words of his will," is said by the Lord Chancellor, in *Mayor &c. of Southmolton* v. *Attorney General,* 5 H. L. Cas. 1, to be the inquiry. In *Attorney General* v. *Mayor of Bristol,* 2 Jac. & Walk. 317, Lord Eldon remarked, after referring to several adjudicated cases, as follows : " The construction in these cases, I take it, must be considered to go upon intention, and the different rules furnished by the cases I have mentioned are to be considered as *indicia* of the intention."

If the leading object of the devise was to benefit King's Chapel or Trinity Church, as the case might be, the application of the surplus income to that object will give effect to that purpose. The testator had been a member, and for a long period an officer, of the religious society worshipping in King's Chapel. The devisees in trust were an association founded for the purpose of promoting the cause of piety and religion, and the use of the surplus income by them would be an appropriation of it in a way entirely consistent with what may be supposed to be the general purposes of the testator. But the more decisive consideration is the fact that the testator has strongly impressed upon this will, by the language he has used therein, that his leading purpose was to benefit King's Chapel. In reference to the devise of this estate in trust to King's Chapel, he denominates it " this my donation which I intend for the benefit of said church." Again, the testator describes this devise as " my estate herein given in trust to the use of King's Chapel." When speaking of the same, in reference to a transfer of such devise 'o Trinity Church, in case the rector and wardens of King's 'hapel should not signify their acceptance of the same in the manner indicated in the will, he describes the estate as " all hereinbefore given to and for the benefit of King's Chapel." also his appointment " of all the gentlemen composing the

vestry of King's Chapel his trustees forever, to inspect and if need be to call to account the minister and wardens for all and any of the income of said estate," and his requiring semi-annual meetings of the vestrymen for that purpose, and assuming that in so doing they will be serving said church and society, indicate the same purpose. These features of the will, and its numerous provisions in reference to this fund, its object and purposes, seem to us properly to withdraw it from those rules of construction which have been applied to naked devises in trust to a trustee disconnected from the administration of the proposed objects of a devise, and where it must necessarily be assumed that the estate given in trust was devoted wholly to public charity.

We have dealt with this case as if the devise to King's Chapel had been fully accepted by them, and all the benefits of the will attached to that society. Under the will of Mr. Price, as already stated, upon certain contingencies all the benefits of this devise made in the first instance to King's Chapel passed to Trinity Church, and they in fact have succeeded to all the rights which would have vested in King's Chapel, had they accepted the trust. If this surplus income may properly be held under this will by Trinity Church to its own use, the question as to the proper disposition and management of the same by Trinity Church, and whether there has been a failure in this respect, is not open on this bill, and would not warrant the interposition of the attorney general. *Parker* v. *May*, 5 Cush. 336. *Attorney General* v. *Federal Street Meeting-House*, 3 Gray, 49.

We have not thought it necessary particularly to consider whether the clause in the will directing the rector and wardens of the church to place the surplus of the money annually arising from the rents of his house at interest upon good security, to be called in as there might be occasion for repairing, enlarging or rebuilding said house, and for keeping his tomb in good and decent repair, would, of itself, present any case of a public charity, and authorize this bill by the attorney general, as, irrespective of this provision, there are the other gifts that have been named which sufficiently raise the question as to the appropriation of the surplus income, and as, in the state of this

property and the large income that has been annually raised therefrom for a long period, there is no ground for anticipating any possible deficiency in the requisite funds to pay annually the £20 specifically directed to be paid out of the same.

The result is that this bill must be dismissed, as, upon the case shown, no occasion exists for the intervention of this court. In coming to this result, we leave the parties in the exercise of their rights as to this property and the enjoyment of the same as they have existed for more than forty years. While we are fully aware that long adverse enjoyment will not be allowed to prevail in contravention to the clearly expressed intention of the donor, yet in a doubtful case as to the construction of a will, such fact is not to be wholly overlooked. *Attorney General* v *Mayor of Bristol,* 2 Jac. & Walk. 321. *Bill dismissed.*